# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

UNITED STATES OF AMERICA     :
       :     CRIMINAL CASE NO.
    v.                 :     3:19-cr-00012-TCB-RGV
       :
BRENDON J. GATES          :

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Brendon J. Gates ("Gates") is charged in a two-count indictment with possession of a firearm after a prior felony conviction, in violation of 18 U.S.C. § 922(g)1), and possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). [Doc. 1].[1] Gates has filed a "Motion to Suppress Evidence," [Doc. 17], and a "Motion to Dismiss Indictment," [Doc. 23], both of which the government opposes, [Docs. 65 & 66]. Following an evidentiary hearing on Gates' motion to suppress evidence held on June 17, 2020,[2] the parties filed post-hearing briefs, [Docs. 63 & 65], and for the reasons that follow, it is **RECOMMENDED** that Gates'

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 57] for the transcript of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at __)." The government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)."

motion to suppress evidence, [Doc. 17], and motion to dismiss the indictment, [Doc. 23], be **DENIED**.[3]

## I.  STATEMENT OF FACTS

On February 13, 2019, Officer Timothy Repetto ("Officer Repetto") of the Breman Police Department was on duty in his marked patrol car, located at the Hill Top gas station on Highway 78 in Breman, Georgia.  (Tr. at 3-6, 16; Gov. Ex. 2).  Around 9:30 a.m., as Officer Repetto was preparing to pull out of the gas station parking lot, he observed a black Chevrolet Silverado truck traveling west on Highway 78 make an abrupt left-hand turn into the gas station parking lot in front of him.  (Tr. at 5, 7-8, 17; Gov. Exs. 1 & 2).  Officer Repetto made eye contact with driver of the truck as he pulled into the gas station, and Officer Repetto observed that the driver seemed "very, very concerned about [his] presence."  (Tr. at 8, 16).  Based on the driver's suspicious demeanor, Officer Repetto performed a GCIC query of the license plate of the truck, which revealed that it had been reported stolen.  (Tr. at 8-9, 19).  After receiving the report that the truck was stolen, Officer Repetto returned to the gas station.  (Tr. at 9-10).  Officer Repetto saw that the

---

[3] Gates also filed a "Preliminary Motion to Suppress Statements," [Doc. 18], but he withdrew that motion as moot at the evidentiary hearing on June 17, 2020, after the government announced that it did not intend to offer the challenged statement at trial, see (Tr. at 2-3); see also [Doc. 55].

stolen truck was parked between the gas pumps and the store facing east, but it was unoccupied.  (Tr. at 10, 19).

After observing the unoccupied truck, Officer Repetto went inside the store to look for the driver.  (Tr. at 10-12).  Officer Repetto had a body-worn camera that he activated as he entered the store.  (Tr. at 10-11; Gov. Ex. 3).  Upon entering the store, Officer Repetto observed an individual standing at the checkout counter whom he recognized as the driver of the stolen truck as he had on a "black[ and] very heavy thick coat" that Officer Repetto had observed him wearing when he first saw him driving the truck.  (Tr. at 12; Gov. Ex. 3 at 00:10-00:17).  The driver, later identified as Gates, was the only customer in the store, and Officer Repetto waited for Gates to complete his purchase and then asked to see Gates' driver's license as Gates was exiting the store.  (Tr. at 12-13, 21; Gov. Ex. 3 at 00:18-00:21).  Gates responded that he "wasn't driving anything," and he walked past Officer Repetto and out of the store.  (Tr. at 13, 22; Gov. Ex. 3 at 00:22-00:23).  Officer Repetto then asked Gates if he came in the black truck and Gates denied that he did.  (Gov. Ex. 3 at 00:24-00:27).  Officer Repetto asked the cashier who else was in the store and who was driving the truck, and the cashier nodded toward Gates.  (Tr. at 13, 21; Gov. Ex. 3 at 00:27-00:30).

Officer Repetto followed Gates out of the store and called to him to come back. (Tr. at 13; Gov. Ex. 3 at 00:31-00:34). At that point, Gates "yelled out" that Officer Repetto "wasn't putting that truck on him" and "took off on foot," and Officer Repetto pursued him. (Tr. at 13; Gov. Ex. 3 at 00:34-00:39). Officer Repetto caught up to Gates along the west side of the store near the dumpster and tackled him to the ground. (Tr. at 14; Gov. Ex. 3 at 00:39-00:45). However, after a struggle, Gates escaped Officer Repetto's grasp and ran north toward Highway 78. (Tr. at 14; Gov. Ex. 3 at 00:45-00:54). Gates slipped and fell as he was fleeing, and while kneeling down, he began reaching for his lower right side. (Tr. at 14; Gov. Ex. 3 at 00:54-0056). Officer Repetto again tackled Gates and a struggle ensued, but Officer Repetto eventually was able to subdue him and place him in custody. (Tr. at 14; Gov. Ex. 00:56-02:37). Officer Repetto conducted an initial pat-down search of Gates and then other law enforcement officers who had arrived on the scene continued the search of his person. (Tr. at 14-15, 24; Gov. Ex. 3 at 03:16-03:45, 04:34-04:36).

Breman Police Department Sergeant Keith Parrish ("Sgt. Parrish") arrived at the gas station after Gates was in custody. (Tr. at 26-28). After arriving at the scene, Sgt. Parrish assisted another law enforcement officer in searching Gates. (Tr. at 28-29). During the search, Sgt. Parrish discovered a firearm holstered in Gates' right boot. (Tr. at 29, 32; Gov. Ex. 3 at 09:23-09:25). Gates was arrested, see

generally (Gov. Ex. 3),[4] and he was subsequently indicted by a federal grand jury and charged with possessing a firearm after having been previously convicted of at least one felony offense and possessing a stolen firearm, [Doc. 1].

## II.  DISCUSSION

### A.     Motion to Suppress Evidence, [Doc. 17]

Gates moves to suppress evidence seized incident to his warrantless arrest, [Doc. 17], contending that "he has been constitutionally aggrieved by a warrantless search based upon a warrantless arrest supported by less than probable cause," [Doc. 63 at 1-2].  Specifically, Gates argues that "Officer Repetto confronted and arrested him based upon information more akin to a hunch or bare suspicion than probable cause."  [Id. at 2].  Gates maintains that "[s]ince a valid arrest is the lynchpin to the warrantless search of [him], it is axiomatic that the search is constitutionally infirm and the items seized incident to the warrantless search must be suppressed."  [Id. at 4].  The government responds that "law enforcement officers had probable cause to arrest [Gates] on multiple charges and conduct a valid search incident to arrest," [Doc. 65 at 1], and alternatively, the

---

[4] Officer Repetto explained to Gates that "at the very minimum," he was under arrest for obstruction of a law enforcement officer as a result of his attempt to flee.  (Gov. Ex. 3 at 08:03-08:08, 08:42-08:44, 09:39-09:45).

officers had "reasonable suspicion of criminal activity to approach, briefly detain, and search [him]," [id. at 1-2].

"The Fourth Amendment of the United States Constitution guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Adigun, Criminal Case No. 1:10–cr–00202–RWS–RGV, 2011 WL 2194253, at *15 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2198308, at *1 (N.D. Ga. June 3, 2011), aff'd, 567 F. App'x 708 (11th Cir. 2014) (per curiam) (unpublished) (alteration in original) (quoting U.S. Const. amend. IV).  "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: '(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.'"  United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005) (quoting United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)); see also United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011); United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989); United States v. Puglisi, 723 F.2d 779, 783 (11th Cir. 1984); United States v. Hunter, Criminal File No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *3 (N.D. Ga. Feb. 25, 2008), adopted at *1.

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place[.]" Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal marks omitted) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (citation omitted) (explaining that there is nothing in the Constitution which prevents a police officer from addressing questions to anyone on the streets); Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006) (citations omitted) ("This Court has decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car."). In Bostick, the Supreme Court held that:

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

501 U.S. at 434 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). Even if officers have no basis for suspecting a particular individual, "they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his . . . [property] – as long as the police do not convey a message that compliance with their requests is required." Id. at 434-35 (internal citations omitted); see also United States v. Graham, No. 2:06-cr-144-WKW, 2007 WL 2746656, at *3 (M.D. Ala. Sept. 19, 2007), adopted at *1, aff'd, 323 F. App'x 793

(11th Cir. 2009) (per curiam) (unpublished) (collecting cases).   An individual's Fourth Amendment right is implicated when he is no longer "free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (citation and internal marks omitted); see also United States v. Mitchell, 407 F. App'x 407, 409 (11th Cir. 2011) (per curiam) (unpublished).   "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."   Bostick, 501 U.S. at 439; see also United States v. Hunter, 373 F. App'x 973, 976 (11th Cir. 2010) (per curiam) (unpublished).

A seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."   Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also Miller, 458 F.3d at 1257; United States v. Lowe, No. CR 311–001, 2011 WL 2600513, at *4 (S.D. Ga. June 16, 2011), adopted by 2011 WL 2710393, at *1 (N.D. Ga. July 12, 2011).   "Some factors which 'might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Hunter, 2008 WL 552881, at *3 (quoting Mendenhall, 446 U.S. at 554); see also

United States v. Edwards, No. 1:05-cr-0097-WSD-JFK, 2007 WL 2479288, at *3 (N.D. Ga. Aug. 28, 2007), aff'd, 307 F. App'x 340 (11th Cir. 2009) (per curiam) (unpublished).  "Other factors courts have considered include prolonged retention of a person's personal effects, a request to accompany the officer to the station, and whether the encounter occurred in a nonpublic place or in a small, enclosed space." United States v. Espinal, Criminal Case No. 1:11–cr–00060–ODE–RGV, 2011 WL 7004195, at *5 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 92451, at *3 (N.D. Ga. Jan. 10, 2012) (citing United States v. Laboy, 979 F.2d 795, 799 (10th Cir. 1992)). "That an officer does not specifically advise the person of his right to walk away does not elevate the encounter into a seizure absent some other evidence of coercion or restricted freedom." Id. (citing United States v. Hathcock, 103 F.3d 715, 719 (8th Cir. 1997)).  "Additionally, an [officer's] unexpressed intent to detain the individual had []he attempted to leave is irrelevant under the objective standard utilized in determining whether a Fourth Amendment seizure has occurred." United States v. Hampton, Criminal Case No. 1:11–cr–00410–RWS–RGV, 2012 WL 1354579, at *7 (N.D. Ga. Mar. 5, 2012), adopted by 2012 WL 1354574, at *1 (N.D. Ga. Apr. 17, 2012), aff'd, 553 F. App'x 955 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted); see also Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011).

Therefore, "[t]he key inquiry is whether, under the totality of the circumstances, 'the police conduct would have communicated to a reasonable

person that he was not at liberty to ignore the police presence and go about his business.'" Edwards, 2007 WL 2479288, at *3 (quoting United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002)).  "'That is, where a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated.'" Id. (quoting United States v. Ramirez, 476 F.3d 1231, 1238 (11th Cir. 2007)).  Thus, a consensual encounter becomes a Terry stop if the defendant's cooperation "is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter.'"   United States v. Wright, No. 3:06cr447/MCR, 2006 WL 3483503, at *2 (N.D. Fla. Nov. 30, 2006) (citation omitted) (quoting United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006)).

An investigative stop of an individual by law enforcement, as opposed to a police-citizen encounter, triggers Fourth Amendment scrutiny.  Hunter, 373 F. App'x at 976.  An officer may briefly detain a person for an investigative Terry stop only when there exists "reasonable suspicion," based on articulable facts, that "criminal activity may be afoot." Terry, 392 U.S. at 30; United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted); Hunter, 373 F. App'x at 976.  Officers need not have probable cause. Sokolow, 490 U.S. at 7 (citation omitted) ("[T]he level of suspicion required for a Terry stop is obviously less demanding than that for probable cause."); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir.

1995); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993); United States v. Cherry, CRIMINAL CASE NO. 1:18-cr-00503-SCJ, 2020 WL 1026712, at *4 (N.D. Ga. Mar. 3, 2020) (citation omitted).

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances.  United States v. Arvizu, 534 U.S. 266, 273-74 (2002); United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).  Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided reducing it to 'a neat set of legal rules.'"  Arvizu, 534 U.S. at 274 (citation and internal marks omitted) (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)).  The officer must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the officers involved in the stop.  Sokolow, 490 U.S. at 7-8; United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989); United States v. Cotton, 721 F.2d 350, 352 (11th Cir. 1983); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1334-35 (N.D. Ga. 2009), adopted at 1326.  A reasonable suspicion determination must be based on common sense judgments and inferences about human behavior.  Illinois v. Wardlow, 528 U.S. 119, 125 (2000); United States v. Cortez, 449 U.S. 411, 418 (1981); United States v. Reed, 402 F. App'x 413, 415 (11th Cir. 2010) (per curiam) (unpublished).

While the reasonable suspicion standard is not onerous, an officer's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion.  Arvizu, 534 U.S. at 274 (citation omitted); see also United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009).  Factors that have been found to properly support reasonable suspicion include: (1) presence in a high crime area, Wardlow, 528 U.S. at 124; Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972); (2) the hour at which the activity is taking place, Arvizu, 534 U.S. at 274, 277; (3) observation by law enforcement of what appears to be criminal conduct based on their experience, Terry, 392 U.S. at 22-23; and (4) evasive conduct, Wardlow, 528 U.S. at 124; United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975); see also United States v. Marcelino, 736 F. Supp. 2d 1343, 1348-49 (N.D. Ga. 2010), adopted at 1345.  As part of a Terry stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."  Terry, 392 U.S. at 27; see also Lanigan v. United States, CR418-258, 2019 WL 8013031, at *6 (S.D. Ga. Nov. 25, 2019), adopted by 2020 WL 865418, at *1 (S.D. Ga. Feb. 20, 2020) (citations omitted).  Mindful of these principles, the Court turns to the totality of the circumstances confronting Officer Repetto when he encountered Gates on February 13, 2019, and the reasonable inferences to be drawn therefrom.

Officer Repetto clearly had reasonable suspicion, at a minimum, to approach Gates and question him about his connection to the stolen truck since he observed Gates driving the truck and recognized him as the driver when he saw Gates in the store.  (Tr. at 12-13).  Whether characterized as a citizen encounter or a Terry stop, Officer Repetto lawfully approached Gates in a public place to ask him questions in furtherance of his investigation of the stolen truck, Mendenhall, 446 U.S. at 553-54; see also United States v. Brown, CRIMINAL CASE NO. 1:17-CR-142-ELR-LTW, 2018 WL 2925919, at *7 (N.D. Ga. May 10, 2018), adopted by 2018 WL 2921109, at *2 (N.D. Ga. June 11, 2018) (citations omitted), and Officer Repetto was authorized to ask Gates for his identification in connection with his investigation, Bostick, 501 U.S. at 434-35; see also United States v. Williams, Case No. CR416-144, 2016 WL 4257744, at *3 (S.D. Ga. July 6, 2016), adopted by 2016 WL 4257760, at *1 (S.D. Ga. Aug. 10, 2016).  Officer Repetto had not physically restrained Gates in any manner when he approached him in the store, but when Gates refused to produce his identification and ran away, saying, Officer Repetto "wasn't putting that truck on him," Officer Repetto lawfully pursued him.  (Tr. at 12-13; Gov. Ex. 3 at 00:18-00:39); see also Wardlow, 528 U.S. at 124.  Gates' flight, coupled with his statement about not "putting that truck on him" and the other facts Officer Repetto knew connecting Gates to the stolen truck, supplied further support for his temporary detention of Gates.  Terry, 392 U.S. at 30; see also United

States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (considering defendant's flight relevant in the reasonable suspicion analysis because the defendant ran at full speed as soon as he saw the officers).  Upon catching up to Gates, Officer Repetto used reasonable force to stop and attempt to restrain Gates so that he could continue his investigation, (Tr. at 14; Gov. Ex. 3 at 00:39-00:45); see also United States v. Wilson, 963 F.3d 701, 704 (7th Cir. 2020) ("Considering the totality of the circumstances—and his flight especially—[defendant's] seizure was supported by the officers' reasonable suspicion that he was engaged in criminal activity."), and when Gates physically resisted and fought with Officer Repetto, his conduct constituted obstruction of a law enforcement officer, see O.C.G.A. § 16-10-24.  By the time Officer Repetto finally managed to obtain control of Gates after he stumbled and fell while fleeing from him after fighting, Officer Repetto had probable cause to arrest Gates for obstruction of a law enforcement officer, United States v. Foskey, 455 F. App'x 884, 888 (11th Cir. 2012) (per curiam) (unpublished), and the warrantless search of his person incident to the arrest was lawful, United States v. Lyons, 403 F.3d 1248, 1254–55 (11th Cir. 2005).

By the time he arrested Gates, Officer Repetto also had probable cause to believe that he had committed the offense of theft by receiving stolen property under the totality of the circumstances known to him as he had observed Gates driving the truck that he later learned was stolen and recognized Gates as the

driver when he saw him in the store, and when Officer Repetto attempted to question him about the truck, Gates falsely denied any connection to it, fled from Officer Repetto, and fought with him in an attempt to elude apprehension. (Tr. at 8-9, 12-14; Gov. Ex. 3); see also Gerrard v. State, 556 S.E.2d 131, 133-34 (Ga. Ct. App. 2001) (law enforcement officer had probable cause to arrest defendant for theft by receiving stolen property in violation of O.C.G.A. § 16-8-7 after confirming with dispatch that a vehicle driven by the defendant was reported stolen). Because these facts and circumstances provided probable cause to arrest Gates for the offense of theft by receiving stolen property, the officers on the scene had an additional and independent basis for the lawful search of his person incident to his arrest. Accordingly, Gates' argument that his arrest was unlawful is without merit, and it is **RECOMMENDED** that his motion to suppress evidence, [Doc. 17], be **DENIED**.

### B.   Motion to Dismiss Indictment, [Doc. 23]

Gates moves to dismiss both counts of the indictment, [Doc. 23], arguing that §§ 922(g)(1) and 922(j) are unconstitutional on their face and as applied to him by infringing his Second Amendment right to bear arms, [id. at 2-7], and his Fifth Amendment right to equal protection of the laws, [id. at 11-17], as well as by exceeding Congress' Commerce Clause powers, [id. at 7-10]. The government

responds that Gates' arguments are foreclosed by binding Eleventh Circuit precedent.  [Doc. 66 at 1].

### 1.   *Second Amendment*

"The Second Amendment to the U.S. Constitution provides: A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." United States v. Jones, 673 F. Supp. 2d 1347, 1350 (N.D. Ga. 2009) (internal marks omitted).  However, "it is clear that this right is neither absolute nor unqualified." Bonidy v. United States Postal Service, 790 F.3d 1121, 1125 n.2 (10th Cir. 2015).  In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court recognized that:

> Like most rights, the right secured by the Second Amendment is not unlimited.   From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose . . . .  Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27 (footnote omitted).   The Supreme Court noted that "these presumptively lawful regulatory measures [were] only [] examples" and the Court's list was not exhaustive.  Id. at 627 n.26.

The government correctly contends that Gates' as-applied and facial challenges to § 922(g)(1) based on the Second Amendment are foreclosed by Heller and binding Eleventh Circuit precedent, [Doc. 66 at 2 (citing United States v. Rozier, 598 F.3d 768, 770-71 (11th Cir. 2010) (per curiam))], and by extension, his essentially identical challenge to § 922(j) similarly fails under the reasoning of Heller and Rozier and other decisions,[5] [id. at 2 n.1 (citing United States v. Haile, 758 F. App'x 835, 837 (11th Cir. 2019) (per curiam) (unpublished))].  In Rozier, the Eleventh Circuit held that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment."  598 F.3d at 771.  Following Rozier, courts in this district repeatedly have denied Second Amendment as-applied and facial challenges to § 922(g)(1), and for the reasons stated in those decisions, Gates' motion to dismiss the § 922(g)(1) charge in the indictment as an infringement of the Second Amendment fails.  See, e.g., United States v. Taylor, CRIMINAL INDICTMENT NO. 1:18-CR-00425-SCJ-JSA, 2019 WL 3904368, at *3 (N.D. Ga. June 17, 2019), adopted by 2019 WL 3891854, at *1 (N.D. Ga. Aug. 19, 2019); Jones, 673 F. Supp. 2d at 1352 ("To the extent Defendant has made out an as-applied challenge to § 922(g)(1), that challenge fails.").

---

[5] Gates acknowledges that both §§ 922(g)(1) and 922(j) have similar interstate nexus elements that vary only to a small degree and are "therefore subject to the same challenge here."  [Doc. 23 at 1 n.1].

Likewise, Gates' Second Amendment challenge to § 922(j) fails for similar reasons as other courts have convincingly concluded that "§ 922(j)'s prohibition on possessing stolen firearms does not violate the Second Amendment." Bowers v. United States, 1:09CR240-1, 2015 WL 13447326, at *3 n.3 (M.D.N.C. Nov. 30, 2015), adopted by 2016 WL 9226992, at *1 (M.D.N.C. June 1, 2016) (citing LaRoche v. United States, Nos. CV 407–054, CR 402–234, 2008 WL 4222081, *2–*3 (S.D. Ga. Sept. 15, 2008); United States v. Ross–Varner, No. 5:14–CR–00206–F–6, 2015 WL 1612045 (E.D.N.C. Apr. 9, 2015)).  As another court in this circuit explained:

> So based upon *Heller,* the Second Amendment is not *per se* violated by a statute of this type.  Furthermore, § 922(j) in no way limits the rights of law-abiding individuals to purchase and possess firearms through normally accepted methods of commerce; it merely limits the trade of illegally acquired weapons. Such reasonable and necessary limitations are certainly constitutional, and [defendant] presents the Court with no authority to the contrary (as there is none).

LaRoche, 2008 WL 4222081, at *2.  Accordingly, Gates' as-applied and facial challenges to § 922(j) are without merit.

## 2.   *Commerce Clause*

Gates' arguments for dismissing the charges in the indictment based on the Commerce Clause likewise are foreclosed by binding precedent.  Both the Supreme Court and the Eleventh Circuit have rejected the arguments Gates advances to challenge § 922(g)(1) as exceeding Congressional authority under the Commerce Clause.  See, e.g., Scarborough v. United States, 431 U.S. 563, 571 (1977);

Jordan, 635 F.3d at 1185; United States v. Wright, 607 F.3d 708, 715-716 (11th Cir. 2010); United States v. Nichols, 124 F.3d 1265, 1266 (11th Cir. 1997) (per curiam); United States v. McAllister, 77 F.3d 387, 390 (11th Cir. 1996); Taylor, 2019 WL 3904368, at *3.  Following the Supreme Court's ruling in Heller, "courts in this district and elsewhere have specifically rejected this argument, finding that '[t]he *Heller* decision . . . does not give any indication that the Supreme Court intended to diminish Congress's power under the *Commerce Clause*.'"  Taylor, 2019 WL 3904368, at *3 (alterations in original) (citation omitted) (quoting Jones, 673 F. Supp. 2d at 1354-55); see also United States v. Moore, Criminal Case No. 3:09cr18, 2009 WL 1033363, *2 (W.D.N.C. April 17, 2009), aff'd, 666 F.3d 313 (4th Cir. 2012).

In rejecting a Commerce Clause challenge to § 922(j), the Eleventh Circuit ruled that "Congress has authority under the Commerce Clause to regulate firearms if there is a 'minimal nexus' between the firearm and interstate commerce," LaRoche, 2008 WL 4222081, at *3 (citation omitted) (citing United States v. LaRoche, 170 F. App'x 124, 125 (11th Cir. 2006) (per curiam) (unpublished)); see also Scarborough, 431 U.S. at 575, and "also pointed out that it had previously determined that § 922(j) was a proper exercise of Congress' authority under the Commerce Clause," LaRoche, 2008 WL 4222081, at *3 (citation omitted).  Specifically, the Eleventh Circuit ruled that "§ 922(j) is a proper exercise of Congress' power under the Commerce Clause, and is subject to the minimal nexus

19

requirement," which is satisfied "when the firearm in question was manufactured outside of the state in which it was found and traveled to that state before the accused took possession of it."  LaRoche, 170 F. App'x at 126 (citing United States v. Pritchett, 327 F.3d 1183, 1186 (11th Cir. 2003)).  Consequently, since the Eleventh Circuit has ruled that Congress acted within its authority under the Commerce Clause in enacting § 922(j), Gates' facial challenge to the statute fails.  Similarly, in an unpublished opinion, the Eleventh Circuit has rejected an as-applied challenge to § 922(j) based on the Commerce Clause as foreclosed by its ruling in Pritchett. Haile, 758 F. App'x at 837.  Therefore, Gates' Commerce Clause arguments against the charges of the indictment likewise fail under binding authority.

### 3.   *Equal Protection*

Finally, although Gates' contention that the charges in the indictment should be dismissed as contrary to the Equal Protection Clause of the Fifth Amendment is not directly foreclosed by binding precedent, the Eleventh Circuit summarily rejected this contention with respect to § 922(g)(1) in an unpublished opinion, see United States v. Reverio, 551 F. App'x 552, 553 (11th Cir. 2014) (per curiam) (unpublished), and his arguments also fail under the persuasive reasoning of numerous lower court decisions.  In Jones, the Honorable Richard W. Story, United States District Judge for the Northern District of Georgia, "thoroughly analyzed and rejected nearly the verbatim argument made by [Gates] here," with

respect to § 922(g)(1).  Taylor, 2019 WL 3904368, at *3 (citing Jones, 673 F. Supp. 2d at 1354-1355); see also [Doc. 23 at 11-16].  "Judge Story found that *Heller* did not confer a 'fundamental' individual right in these circumstances that is protected by strict scrutiny review, at least with regard to the illegal possession of firearms by individuals subject to a legal disqualification."  Taylor, 2019 WL 3904368, at *3. "Following the overwhelming weight of the caselaw, Judge Story rather applied intermediate scrutiny to Section 922(g), and followed several persuasive decisions finding that prohibiting felons from possessing firearms is substantially related to the important governmental objective of public safety and is therefore constitutional."  Id. (citation omitted).  "The conclusion of *Jones* naturally follows from the Supreme Court's language in *Heller* and the Eleventh Circuit's subsequent decisions clarifying *Heller*'s limited application to Section 922(g), including *Rozier*."  Id.  Gates has not made any Equal Protection Clause arguments with respect to § 922(j), see [Doc. 23 at 11-16], nor has he cited any authority to support the contention that the statute either facially or as-applied in this case deprives him of equal protection, [id.].  Accordingly, Gates' Equal Protection Clause challenge to the charges of the indictment is without merit.

### III.  CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Gates' "Motion to Suppress Evidence," [Doc. 17], and "Motion to Dismiss Indictment," [Doc. 23], be **DENIED**.

There are no other motions pending before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of the trial. Accordingly, **IT IS ORDERED** and **ADJUDGED** that this action be, and the same is hereby, declared **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED** and **RECOMMENDED**, this 7th day of October, 2020.


*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE